## CORKRAN v. UNITED STATES.
### Civil Action No. 422.

District Court, S. D. West Virginia.
Aug. 14, 1948.

William W. Roberts, of Huntington, W. Va., for plaintiff.

Leslie E. Given, U. S. Atty., of Charleston, W. Va., and Milton J. Ferguson and Philip A. Baer, Asst. U. S. Attys., both of Huntington, W. Va., for defendant.

WATKINS, District Judge.

■ This is an action under the Federal Tort Claims Act, 28 U.S.C.A. § 921 et seq., in which plaintiff as administratrix of her deceased husband seeks to recover damages for the death of her husband, Jere Payne Corkran, Jr., who was killed when a Navy plane collided with an Aeronca student trainer plane operated by the husband. The unfortunate accident occurred near Huntington, W. Va., on August 11, 1946. The

three occupants of the Navy plane and the sole occupant of the student trainer plane were all killed. The evidence establishes the following facts:

Corkran was a student pilot and had been issued his student pilot certificate. He had been flying with his instructor for about one month, and on July 31 was found to be qualified to do solo flying. Nearly every day thereafter until the date of the accident he did some solo flying, although he had had a total of only four hours of solo flying to his credit when the accident occurred. On the morning of the accident he had taken his instructor up in the air for about thirty minutes during which he handled the controls in a satisfactory manner, after which the instructor got out of the plane to permit him to practice some landings. At the Huntington-Chesapeake Airport on this occasion, his plane overshot the airfield on one of his practice landings, whereupon he continued in a westerly direction and ascended to a height of about 700 feet, and to a point about one-half mile west of the airport, when it made a left bank or rectangular turn. It then leveled off and continued south to about the middle of the Ohio river (which parallels the airport runway) when it banked, or turned left again, and after leveling off, continued up the Ohio river in an easterly direction, preparing to again attempt a landing. When a plane is making its pattern, or going around an airport preparing to land, it it is flying at an altitude of less than 1000 feet, it is in the traffic level where other planes may be either taking off or landing, and care and diligence require that such plane make right angle turns and that it level off after making each turn. If it makes a continuous circle with the wings banked or tilted, the vision of the pilot is so obstructed that he can not see another plane approaching him from a point outside the circle. The wings of the plane while in a bank or circle obstruct the view of the pilot outside the circle. The purpose of leveling off after each ninety degree turn is to permit the pilot to see other aircraft to both his left and right. If the aircraft is flying over the airport at an altitude of more than 1000 feet it is not in the traffic level and is not required to make the rectangular pattern. The traffic around airports in the traffic level is rectangular to the left, except in cases where two airports are close together and the Civil Aeronautics Administration (hereinafter called CAA) requires one of them to have rectangular traffic to the right to keep the traffic of the two airports from running together. Corkran made his right angle turns and leveled off between each turn, and made his flight pattern in conformity to accepted standards of care and diligence in flying about airports at an altitude of less than 1000 feet.

The Navy plane, a twin engine Beechcraft, had left Washington, D. C., and radioed to the airport about three miles east of Huntington that its destination was Cincinnati. Lieutenant Commander Clark Lee Henderson was the pilot and two passengers were with him. Visibility was very good. The pilot requested the surface wind at the airport and was advised that it was from the southwest at 6 miles per hour. He was given the altimeter setting and was advised that there was no control tower at the airport. At smaller airports, such as this one, there are no control towers, and each pilot is required to exercise accepted standards of care, and to abide by the rules and regulations of the CAA and the rules of the local airport in making its pattern for landing. The Navy pilot was told that he should "check the local traffic in and out of the field as there was considerable circling, landings and take-offs." The pilot replied "WILCO," which, in aviation circles, means "Message received, understood and will comply." The Navy Beechcraft went down the north side of the airport to a point about one-fourth of a mile west and north of the airport. While traveling at about maximum speed (190 miles per hour) it banked or circled to the left at an altitude of about 700 feet. It did not make a 90° turn and then level off at each turn, as did the student pilot plane, but made one continuous circle of the west end of the airport. While making that circle the wings of the Beechcraft were banked, the right wing being tilted upward at a sharp angle, so that the pilot's view was obstructed to such an extent that he could not see the Aeronca plane approaching from the

west, outside of the arc or circle made by the Beechcraft. The large Navy plane was then making about 170 miles per hour while the Aeronca trainer plane was making about 75 miles per hour. At the time of the collision the Aeronca was traveling in a straight course up the river in an easterly direction and was in level flight at an altitude of about 700 feet. The Beechcraft was traveling in a southeasterly direction, in an arc or bank of about 40°, was about the same altitude, and approached the Aeronca from the left. The right wing of the Beechcraft struck the left strut of the Aeronca. The strut is the bar or rod which extends from the wing to the fuselage and supports the wing of a plane.

Rule 7 of the Huntington-Chesapeake Airport, in effect on the date of this accident, provides: "Planes arriving at the airport will enter the traffic on either the down-wind or up-wind leg at a 45° angle, 700 feet altitude, and conform the rectangular traffic pattern." Section (b) of Chapter 1 of the rules of flight of the CAA, under "Take-offs and Landings" in effect at the date of accident, provides: "Aircraft approaching for a landing shall circle the airport or other landing area sufficiently to observe other traffic, unless the pilot receives other instructions from the air traffic control tower operator." The Navy pilot violated both of these rules because the manner in which he circled the airport was obviously not sufficient for him to observe other traffic, and he did not conform the rectangular traffic pattern. Had he made the rectangular pattern, and leveled off after each turn, as care and diligence required, he would have been able to see the Aeronca plane as it proceeded up the river. At the larger airports where there is a control tower, the pilots have someone to tell them what to do, and the general rules are not controlling, but on a smaller airport such as this one, where there is no control tower, these rules are applicable.

The CAA has rules and regulations which govern such planes as to right of way when they approach each other on crossing courses. One rule provides: "When two aircraft are on crossing courses at approximately the same altitude, the aircraft on the left shall give way." Another rule provides: "Aircraft shall be flown at least 500 feet apart except by prearrangement of the pilots in command of the aircraft." Since these two planes were on crossing courses, at the same altitude, and since the Aeronca had the Beechcraft on its left, the Aeronca had the right of way, and it was the duty of the pilot of the Beechcraft to alter his course to the right so that he would clear the Aeronca by at least 500 feet to the rear of the Aeronca. (See page 3 of Digest of CAA Regulations.) Another rule provides: "An overtaken aircraft has the right of way and the overtaking aircraft, whether climbing, descending or in level flight shall alter its course to the right." Since the Beechcraft was flying in an arc, and was approaching the smaller Aeronca plane a little from the rear of the left side of that plane, the Beechcraft violated this rule in failing to keep clear of the overtaken aircraft by altering its own course to the right.

The physical evidence makes it quite clear that the planes struck in this manner. The front of the right wing tip of the Beechcraft was found in the wreckage of the Aeronca. The particular location of the wing tip is made certain by the Navy markings found on it. The wing tip, which was exhibited in court, was grey and had a deep impression in it similar to the shape of the strut of the Aeronca plane. In that impression there was considerable orange paint. The strut and the wings of the Aeronca were painted orange while the fuselage was blue. The left strut of the Aeronca was also offered in evidence at the trial, and when the two pieces were examined, with their relative positions on the planes, it was apparent that the right front tip of the Beechcraft struck the left strut of the Aeronca from the left and to the rear. The evidence of the more credible eye witnesses tend to corroborate such finding. The Aeronca fell in a spiral and landed about 100 feet south of the south shore of the Ohio river. The Beechcraft traveled south after the collision and fell to the ground about 800 feet south and a little to the west of where the Aeronca landed.

Although Corkran had little experience as a pilot, the evidence shows that he was

observing the rules and regulations at the time of the accident. There is no evidence to justify a finding of contributory negligence on his part. He had the right of way. When he saw the larger Navy plane proceeding west past the airport with its wheels up, he had every reason to believe that it was not going to land and to temporarily dismiss it from his mind. If he later saw it approaching him either from the left or from the rear, he had reason to assume that it would obey the right of way regulations. If approaching from the left at cross courses it would alter its course to the right so as to pass at least 500 feet behind him. If approaching from the rear the Beechcraft would alter its course to the right so as to clear the overtaken aircraft. If, at the last minute the student pilot realized that the pilot of the Beechcraft had not seen him, and was not altering his course, there was nothing that Corkran could have done to avoid the accident, because the Beechcraft was then traveling more than twice the speed of the Aeronca. Corkran could not tell what the Beechcraft was going to do. If Corkran turned to the right he would not have time to get out of the way. He had no reverse and not much more speed. The safest thing for him to do would seem to go straight ahead, which he did.

Corkran was 24 years of age and is survived by his widow and one child, age 3 years, both of whom were solely dependent upon him for their support. At the time of his death he was employed by the Tri-State Casket Company, earning $175 per month.

From this evidence I find that the pilot of the Navy Beechcraft was negligent in the manner that he circled the airport and approached the Aeronca, particularly in violating the rules and regulations mentioned above. Such negligence was the proximate cause of Corkran's death. I find that the sum of $10,000 is an appropriate verdict. Counsel may submit an appropriate order.